UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| FURMAN JERRY ROGERS III, Individually and On Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>          v.<br><br>RICHARD M. WHITING and MARK N. SCHROEDER,<br><br>                    Defendants. | No.<br><br><u>CLASS ACTION</u><br><br>**COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br><br><br><u>JURY TRIAL DEMANDED</u> |

**SUMMARY OF THE ACTION**

1.      This is a securities class action on behalf of all persons who purchased Patriot Coal Corporation ("Patriot Coal" or the "Company") securities between October 21, 2010 and July 6, 2012, inclusive (the "Class Period"), against certain of Patriot Coal's current and previous officers for violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Patriot Coal is a major coal supplier in the eastern United States, with fourteen mining operations in the Appalachia and Illinois Basin regions.  Environmental problems caused by Patriot Coal's operations have required the Company to undertake court-ordered remediation.  This matter arises out of false and misleading statements concerning the Company's environmental remediation efforts.

3.      The Company incurred remediation costs after Judge Robert Chambers of the U.S. District Court for the Southern District of West Virginia ordered in August 2010 that Patriot Coal clean up selenium pollution at two of its surface coal mines in West Virginia.

4.      Judge Chambers also required the Company to post a $45 million letter of credit

to ensure that it installs water treatment equipment at two of its mines.  One of Patriot Coal's subsidiaries, Apogee Coal Company, LLC ("Apogee"), was ordered to install a fluidized bed reactor system to treat selenium discharges.  Another subsidiary, Hobet Mining, LLC ("Hobet"), was required to submit a treatment plan for its Hobet No. 22 mine.

5.     As alleged herein, Defendants violated Generally Accepted Accounting Principles ("GAAP") and U.S. Securities and Exchange Commission ("SEC") rules because they failed to properly account for the costs associated with the court-ordered remediation obligations related to certain of the Company's selenium water treatment requirements.[1]  Defendants capitalized these costs instead of recording them as expenses, thereby overstating the Company's financial results.  In addition, during the Class Period Defendants knew but concealed from investors the following   material adverse information: (i) the Company's internal controls over financial reporting were materially inadequate; (ii) Defendants improperly accounted for selenium treatment facility liabilities at the  Company's mines; (iii) the Company's reported financial results were overstated and were not presented  in conformity with GAAP; (iv) the Company's business health was weakening; and (v) as a result of the forgoing, the Company would not survive as a going concern.

6.     In February 2012, the SEC began questioning Patriot Coal's accounting for certain of its court-ordered selenium water treatment obligations.  On May 8, 2012, in response to the comments received from the SEC, Defendants were forced to reveal that the Company's

---

[1] Selenium is a naturally occurring substance, widely distributed in the earth's crust and commonly found in sedimentary rock. Selenium is toxic at high concentrations and exposure in humans is associated with cardiovascular effects, such as tachycardia, gastrointestinal symptoms including nausea, vomiting and diarrhea, and neurological symptoms such as aches, irritability, chills and tremors.  In coal mining operations, selenium can be discharged to surface water when mine tailings are exposed to rain and other natural element.

previously issued consolidated financial statements for the years ended December 31, 2011 and December 31, 2010 should no longer be relied upon.  Further, Defendants admitted that it was necessary to restate the Company's previously issued consolidated financial statements to accrue a liability and recognize a loss for the estimated costs of installing the court-ordered water treatment facilities.  This restatement increased Patriot Coal's asset retirement obligation expense and net loss for the years ended December 31, 2011 and 2010 by $23.6 million and $49.7 million, respectively.  The restatement adjustments also increased the Company's reported net losses for the years ended December 31, 2010 and 2011, by 104% and 20%, respectively.  Moreover, the Company disclosed that management identified a control deficiency in its internal control over financial reporting associated with the accounting treatment for the Apogee and Hobet water treatment facilities.

7.      In addition to overstating its financial results and failing to maintain adequate internal controls, defendants also caused the Company to issue a misleadingly aggressive sales forecast for 2013.  When the Company withdrew its 2013 forecast, Patriot Coal stock price declined 18% in a single day, from $4.83 per share on May 14, 2012, to a closing price of $3.94 on May 15, 2012, on volume of more than 19 million shares.

8.      Then, on July 9, 2012 Patriot Coal shocked the market when it announced that it and substantially all of its wholly owned subsidiaries have filed voluntary petitions for reorganization under Chapter 11 of the U.S. Bankruptcy Code.  Following this announcement, Patriot Coal's shares again plummeted, from a closing price of $2.19 on July 6, 2012, to a closing price on July 9, 2012 of $0.61 -- a one-day decline of 72% on volume of more than 38 million shares.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under sections 10(b) and section 20(a) of the Exchange Act, 15 U.S.C. §78j(b) and §78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240,10b-5.

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

11.     This Court has jurisdiction over each Defendant named herein because each defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) and section 27 of the Exchange Act because: (i) one or more of the Defendants resides in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Patriot Coal, occurred in this District; and (iii) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect on this District.

## PARTIES

13.     Plaintiff, Furman Jerry Rogers III, purchased securities of Patriot Coal during the Class Period as set forth in the accompanying certification, incorporated by reference herein, and was damaged as a result of Defendants' wrongdoing as alleged in this Complaint.

14.     Defendant Richard M. Whiting ("Whiting") was Patriot Coal's CEO from October 2007 to May 2012, President from September 2010 to May 2012 and from October 2007

4

to July 2008, and a director from October 2007 to May 2012.  Defendant Whiting also held various positions at Patriot Coal's predecessor companies from 1976 to October 2007. Throughout the Class Period, defendant Whiting made false and misleading statements regarding the Company's environmental remediation efforts, financial health, business prospects as a going concern, and internal controls.  Because of his positions with Patriot Coal, Defendant Whiting had a substantial role in the day-to-day operations of the Company and possessed the power and authority to: (i) direct or cause the direction of the management and polices of the Company's employees; and (ii) control the contents of the Company's annual reports, press releases, and presentations to securities analysts, money and portfolio managers, and investors, *i.e.*, the market. Defendant Whiting was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of defendant Whiting's positions with the Company, and his access to material, non-public information available to him but not to the public, defendant Whiting knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.

15.     Defendant Mark N. Schroeder ("Schroeder") is Patriot Coal's Senior Vice President and Chief Financial Officer and has been since October 2007 and Principal Accounting Officer and has been since June 2012.  Throughout the Class Period, defendant Schroeder made false and misleading statements regarding the Company's environmental remediation efforts, financial health, business prospects as a going concern, and internal controls.   Defendant Schroeder was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to

prevent their issuance or cause them to be corrected. Because of defendant Schroeder's positions with the Company, and his access to material, non-public information available to him but not to the public, defendant Schroeder knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.

16.     Non-party Patriot Coal is a Delaware corporation and a leading producer of thermal and metallurgical coal in United States.  The Company maintains operations and coal reserves in Appalachia and the Illinois Basin coal regions.  The principal executive offices of Patriot Coal are located at 12312 Olive Boulevard, Suite 400, St. Louis, Missouri.  On July 9, 2012, Patriot Coal announced that it and substantially all of its wholly owned subsidiaries filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of New York.

### FRAUDULENT SCHEME AND COURSE OF BUSINESS

17.     Defendants are liable for: (i) making material false statements; and (ii) failing to disclose material, adverse facts known to them about Patriot Coal.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Patriot Coal securities was a success, as it: (i) deceived the investing public as to Patriot Coal's business prospects and operations; (ii) kept the price of Patriot Coal securities artificially inflated; and (iii) caused plaintiff and other members of the Class to purchase Patriot Coal securities at inflated prices.

### GAAP STANDARDS

18.     Financial statements filed with the SEC are required to comply with GAAP. GAAP are those principles recognized by the accounting profession as the conventions, rules,

6

and procedures necessary to define accepted accounting practice at a particular time.   SEC Regulation SX (17 C.F.R. §210.4-01(a)(l)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.

19.     GAAP, Accounting Standards Codification ("ASC") 410 Asset Retirement and Environmental Obligations applies to legal obligations associated with asset retirements. GAAP requires upon the initial recognition of a liability for an asset retirement obligation, an entity shall capitalize an asset retirement cost by increasing the carrying amount of the related long-lived asset by the same amount of the liability. ASC 410-20-25-5.   However, this requirement to capitalize such costs does not apply to costs related to environmental contamination as is the case with the Company's court-ordered remediation obligations concerning its "selenium water treatment requirements." In response to environmental contamination, entities such as Patriot Coal may be required to: (i) repair, better, or replace assets causing contamination; and (ii) restore the environment to its original, pre-contamination condition.  Pursuant to paragraphs ASC 410-30-25-16 through 25-18, these conditions "shall be charged to expense."

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

20.     On October 21, 2010, Patriot Coal issued a press release announcing its court-ordered remediation obligation.  The press release stated that the costs relating to the treatment of selenium discharges would be capitalized "over the estimated operating life of the treatment system." This method of accounting for the remediation expenses did not conform with applicable financial reporting requirements, however, nor was this a "fair presentation" of Patriot

7

Coal's operations and financial position.  The press release stated in part:

> During the 2010 third quarter, the Federal District Court in Huntington, West
> Virginia ruled on selenium lawsuits brought by various environmental
> constituencies against the Company's Apogee and Hobet subsidiaries. Pursuant to
> the court order, Apogee was ordered, among other things, to install a biological-
> based fluidized bed reactor system to treat selenium discharges at certain affected
> outfalls. Additionally, Hobet was ordered to submit and implement a treatment
> plan to come into compliance with applicable selenium discharge limits under its
> Hobet 22 permit. As a result of this order, the Company recognized a charge of
> $20.7 million, which is expected to be spent over the estimated operating life of
> the treatment system. The charge was included in reclamation and remediation
> obligation expense in the 2010 third quarter. Additionally, the Company estimates
> the capital investment required as part of the order will be approximately $50.0
> million.

21.     On November 5, 2010, Patriot Coal filed a Form 10-Q with the SEC that was

signed by defendant Schroeder.   The 10-Q further explained the Company's accounting

treatment for court-ordered remediation costs.  In addition, the Form 10-Q included consolidated

financial statements of the Company's operations for the three months ended September 30,

2010.   The consolidated financial statements, and Company's the explanation concerning

capitalization of the remediation costs, were both false and misleading because they failed to

comply with GAAP.   The court-ordered remediation costs should have been recorded as

expenses -- not as capital expenditures.    Thus, the Company's reported expenses were

understated, thereby overstating the Company's financial performance.   Finally, in addition to

these false and misleading statements, the Form 10-Q falsely attested to the adequacy of the

Company's internal controls.  The Form 10-Q stated in part:

**PATRIOT COAL CORPORATION**

**UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**

| | Three Months Ended September 30, | | Nine Months Ended September | |
|---|---|---|---|---|
| | **2010** | **2009** | **2010** | **2009** |
| | (Dollars in thousands, except share and per share data) | | | |
| **Revenues** | | | | |
| Sales | $  496,271 | $  493,147 | $  1,494,279 | $  1,501,034 |
| Other revenues | 4,412 | 13,042 | 12,653 | 41,087 |
| | | | | |
| Total revenues | 500,683 | 506,189 | 1,506,932 | 1,542,121 |
| **Costs and expenses** | | | | |
| Operating costs and expenses | 484,168 | 470,708 | 1,421,862 | 1,432,533 |
| Depreciation, depletion and amortization | 44,782 | 50,413 | 144,744 | 155,749 |
| Reclamation and remediation obligation expense | 31,291 | 9,206 | 53,141 | 23,268 |
| Sales contract accretion | (30,927) | (93,988) | (89,970) | (232,516) |
| Restructuring and impairment charge | 167 | — | 15,005 | — |
| Selling and administrative expenses | 10,323 | 11,272 | 36,295 | 35,518 |
| Income from equity affiliates | (3,491) | (1,187) | (5,183) | (75) |
| Net gain on disposal or exchange of assets | (3,531) | (10) | (45,086) | (4,071) |
| | | | | |
| **Operating profit (loss)** | (32,099) | 59,775 | (23,876) | 131,715 |
| Interest expense | 16,952 | 10,656 | 40,779 | 28,386 |
| Interest income | (3,128) | (3,723) | (9,819) | (13,046) |
| | | | | |
| **Income (loss) before income taxes** | (45,923) | 52,842 | (54,836) | 116,375 |
| Income tax provision | 70 | — | 470 | — |
| | | | | |
| **Net income (loss)** | $  (45,993) | $  52,842 | $  (55,306) | $  116,375 |
| | | | | |
| | | | | |
| **Weighted average shares outstanding** | | | | |
| Basic | 90,968,377 | 90,277,301 | 90,889,782 | 82,753,236 |
| Effect of dilutive securities | — | 794,839 | — | 558,338 |
| | | | | |
| Diluted | 90,968,377 | 91,072,140 | 90,889,782 | 83,311,574 |
| | | | | |
| | | | | |
| **Earnings (loss) per share** | | | | |
| Basic | $  (0.51) | $  0.59 | $  (0.61) | $  1.41 |
| Diluted | $  (0.51) | $  0.58 | $  (0.61) | $  1.40 |

*September 1, 2010 U.S. District Court Ruling*

On September 1, 2010, the U.S. District Court found Apogee in contempt for failing to comply with the March 19, 2009 consent decree. Apogee was ordered to

install an FBR water treatment facility for three outfalls and to come into compliance with applicable selenium discharge limits by March 1, 2013. Additionally, the court ordered Hobet to submit by October 1, 2010 a proposed schedule to develop a treatment plan for one outfall and to come into compliance with applicable discharge limits under the Hobet Surface Mine No. 22 permit by May 1, 2013. Apogee and Hobet were required to jointly establish an irrevocable $45 million letter of credit in support of the requirements of this ruling. The court also appointed a Special Master who is authorized to monitor, supervise and direct Apogee's and Hobet's compliance with, and hear disputes that arise under, the September 1, 2010 order as well as other orders of the U.S. District Court.

FBR technology had not been used to remove selenium or any other minerals discharged at surface coal mining operations prior to our pilot project that began in February 2010. The FBR water treatment facility, required by the ruling, will be the first of its kind constructed for selenium removal on a commercial scale. We anticipate that the design of the facility will be finalized in mid- to late- 2011 and then construction can begin.

Pursuant to the September 1, 2010 ruling, we will record the costs to install the FBR water treatment facility for the three Apogee outfalls as capital expenditures when incurred. The capital expenditure for the facility is estimated to be approximately $50 million. In addition, the estimated future on-going operating cash flows required to meet our legal obligation for remediation at the three Apogee outfalls have changed from our original estimates based on the September 1, 2010 ruling. As such, we increased the portion of the environmental liability related to Apogee by updating the fair value of the on-going costs related to these three outfalls and recorded the $20.7 million difference between this updated value and our previously recorded liability directly to income, through "Reclamation and remediation obligation expense" in the third quarter of 2010.

* * *

Item 4.        Controls and Procedures.

Our disclosure controls and procedures are designed to, among other things, provide reasonable assurance that material information, both financial and non-financial, and other information required to be disclosed under the securities laws is accumulated and communicated to senior management, including the Chief Executive Officer and Chief Financial Officer, on a timely basis. Under the direction of the Chief Executive Officer and Chief Financial Officer, management has evaluated our disclosure controls and procedures as of September 30, 2010, and has concluded that the disclosure controls and procedures were adequate and effective as of such date.

22.    On February 1, 2011, Patriot Coal issued a press release in which defendant Schroeder touted "improved operating costs" and higher earnings before interest, taxes,

10

depreciation, and amortization ("EBITDA").  Defendant Schroeder's statements were false and misleading because they were based on improperly accounted for financial figures.  The press release stated in part:

> Commenting on the fourth quarter, Patriot Senior Vice President and Chief Financial Officer Mark N. Schroeder noted, "As a result of solid production across nearly all mining complexes, we recognized EBITDA of $42.8 million. The higher EBITDA resulted from higher average selling prices, as well as improved operating costs per ton compared with our 2010 third quarter. ...."

23.    That same day, Patriot Coal hosted a conference call with investors, media representatives, and analysts discussing the Company's financial results.  During the conference call, defendant Whiting touted "significant improvement" in the Company's "operating results." Moreover, an analyst praised the Company's continued ability "to keep a lid on costs and keep putting up this type of performance." Defendant Schroeder responded to this analyst by confirming the Company's purported decline in absolute costs.  Defendant Schroeder failed to disclose the truth about the Company's improper accounting for certain costs that were recorded as capital expenditures as opposed to expenses.   This was the actual reason behind the Company's apparent low costs.   The following exchange occurred between the analyst participating on the call and Defendants was as follows:

> **RICK WHITING [CEO and PRESIDENT, PATRIOT COAL]:** ...Regarding thermal sales, since our last call, we have booked around 2 million tons for 2011 delivery, including almost 1 million tons to be shipped to Europe, as I mentioned earlier. Following our recent sales, we have just under 2 million tons of Appalachian thermal coal remaining unpriced and just under 1 million tons of Illinois basin coal remaining unpriced for 2011 delivery. Again, most of this unpriced volume is in the second half of the year. So, in summary, our operating results this quarter showed significant improvement. We are continuing to focus on our safety and our productivity initiatives.
>
> * * *
>
> **SHNEUR GERSHUNI [ANALYST, UBS]:** My first question, just to kick off, is

on the cost side. The fourth quarter is essentially the second quarter in a row where you absolute costs declined in Appalachia. I was wondering if you can give us some color on what you 're doing to keep a lid on costs and keep putting up this type of performance.

**MARK SCHROEDER [CFO, PATRIOT COAL]:** …As you know, and I guess the last piece of that repairs and maintenance, over the last couple of years, we've tried to spend a little more money on the rolling stock and the capital expenditures. We did that so that we would not have as much down time and repair work. That's paying off a little bit as well. I'm not saying we don't have that, but we have tried to limit the amount of the down time with putting in some of the new equipment, the rolling stock equipment, really over the latter part of 2010. And as we go into 2011, you'll see some of the same.

24.     On February 25, 2011 Patriot Coal filed with the SEC a Form 10-K that was signed by Defendants and discussed the accounting treatment pf court-ordered remediation costs. In addition, the Form 10-K included consolidated financial statements of the Company's operations for the year ending December 31, 2010.   Both the explanation regarding the capitalization of the remediation costs and the consolidated financial statements were false and misleading because they failed to comply with GAAP.   The court-ordered remediation costs should have been recorded as expenses, not as capital expenditures.   Thus, the Company's reported expenses were understated, thereby overstating the Company's financial performance. Finally, in addition to these false and misleading statements, the Form 10-K falsely attested to the adequacy of the Company's internal controls, stating in part:

> Pursuant to the September 1, 2010 ruling, we will record the costs to install the FBR water treatment facility for the three Apogee outfalls as capital expenditures when incurred. The capital expenditure for the facility is estimated to be approximately $50 million. In addition, the estimated future on-going operating cash flows required to meet our legal obligation for remediation at the three Apogee outfalls have changed from our original estimates based on the September 1, 2010 ruling. As such, we increased the portion of the liability related to Apogee by updating the fair value of the on-going costs related to these three outfalls and recorded the $20.7 million difference between this updated value and our previously recorded liability directly to income, through reclamation and remediation obligation expense in the third quarter of 2010.

12

\* \* \*

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2010 | 2009 | 2008 | 2007 | 2006 |
| | (In thousands, except for share and per share data) | | | | |
| **Results of Operations Data:** | | | | | |
| Revenues | | | | | |
| Sales | $ 2,017,464 | $ 1,995,667 | $ 1,630,873 | $ 1,069,316 | $1,142,521 |
| Other revenues | 17,647 | 49,616 | 23,749 | 4,046 | 5,398 |
| Total revenues | 2,035,111 | 2,045,283 | 1,654,622 | 1,073,362 | 1,147,919 |
| Costs and expenses | | | | | |
| Operating costs and expenses | 1,900,704 | 1,893,419 | 1,607,746 | 1,109,315 | 1,051,932 |
| Depreciation, depletion and amortization | 188,074 | 205,339 | 125,356 | 85,640 | 86,458 |
| Reclamation and remediation obligation expense | 63,034 | 35,116 | 19,260 | 20,144 | 24,282 |
| Sales contract accretion | (121,475) | (298,572) | (279,402) | — | — |
| Restructuring and impairment charge | 15,174 | 20,157 | — | — | — |
| Selling and administrative expenses | 50,248 | 48,732 | 38,607 | 45,137 | 47,909 |
| Other operating (income) expense: | | | | | |
| Net gain on disposal or exchange of assets[1] | (48,226) | (7,215) | (7,004) | (81,458) | (78,631) |
| Loss (income) from equity affiliates[2] | (9,476) | (398) | 915 | (63) | (60) |
| Operating profit (loss) | (2,946) | 148,705 | 149,144 | (105,353) | 16,029 |
| Interest expense | 57,419 | 38,108 | 23,648 | 8,337 | 11,419 |
| Interest income | (12,831) | (16,646) | (17,232) | (11,543) | (1,417) |
| Income (loss) before income taxes | (47,534) | 127,243 | 142,728 | (102,147) | 6,027 |

13

| | | | | | |
|---|---:|---:|---:|---:|---:|
| Income tax provision | 492 | — | — | — | 8,350 |
| Net income (loss) | (48,026) | 127,243 | 142,728 | (102,147) | (2,323) |
| Net income attributable to noncontrolling interest[2] | — | — | — | 4,721 | 11,169 |
| Net income (loss) attributable to Patriot | (48,026) | 127,243 | 142,728 | (106,868) | (13,492) |
| Effect of noncontrolling interest purchase arrangement | — | — | — | (15,667) | — |
| Net income (loss) attributable to common stockholders | $ (48,026) | $ 127,243 | $ 142,728 | $ (122,535) | $ (13,492) |
| Earnings (loss) per share, basic | $ (0.53) | $ 1.50 | $ 2.23 | $ (2.29) | N/A |
| Earnings (loss) per share, diluted | $ (0.53) | $ 1.49 | $ 2.21 | $ (2.29) | N/A |
| Weighted average shares outstanding - basic | 90,907,264 | 84,660,998 | 64,080,998 | 53,511,478 | N/A |
| Weighted average shares outstanding - diluted | 90,907,264 | 85,424,502 | 64,625,911 | 53,546,116 | N/A |
| **Balance Sheet Data (at period end):** | | | | | |
| Total assets | $ 3,810,036 | $ 3,618,163 | $ 3,622,320 | $ 1,199,837 | $1,178,181 |
| Total liabilities[3] | 2,966,955 | 2,682,669 | 2,782,139 | 1,117,521 | 1,851,855 |
| Total long-term debt, less current maturities | 451,529 | 197,951 | 176,123 | 11,438 | 20,722 |
| Total stockholders' equity (deficit) | 843,081 | 935,494 | 840,181 | 82,316 | (673,674) |

Item 9A. Controls and Procedures.

As of the end of the period covered by this Annual Report on Form 10-K, we carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures. Based upon that evaluation, the CEO and the CFO have each concluded that our disclosure controls and procedures were designed, and were effective, to ensure that information required to be disclosed in our reports under the Securities Exchange Act of 1934, as amended, (the "Exchange Act") is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms.

* * *

**Management's Report on Internal Control Over Financial Reporting**

Management is responsible for maintaining and establishing adequate internal control over financial reporting. Our internal control framework and processes were designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of our consolidated financial statements for external purposes in accordance with U.S. generally accepted accounting principles.

* * *

25.     Along with signing the Form 10-K for fiscal year 2010, Defendants signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that falsely attested to the purported accuracy and completeness of its disclosures and the effectiveness of the Company's internal controls.  The certification stated in pertinent part, as follows:

I, Richard M. Whiting, certify that:

  1.     I have reviewed this annual report on Form 10-K of Patriot Coal Corporation;

  2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

  3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

  4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

* * *

        (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this

report based on such evaluation; and

* * *

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: February 25, 2011
/s/ Richard M. Whiting
Richard M. Whiting
Chief Executive Officer

* * *

I, Mark N. Schroeder, certify that:

1.   I have reviewed this annual report on Form 10-K of Patriot Coal Corporation;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

* * *

16

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

* * *

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: February 25, 2011
 /s/ Mark N. Schroeder
Mark N. Schroeder
Chief Financial Officer

26.    On April 21, 2011, Patriot Coal issued a press release in which defendant Whiting touted an "increased EBITDA" and "further performance improvements in 2012." Defendant Whiting also provided investors with aggressive guidance, stating that he expects to "realize increased EBITDA of around $50 million in 2012 and $150 million in 2013." These statements were false and misleading because they were based on financial results that were not presented in conformity with GAAP.  The press release stated in part:

"This quarter marked a very solid start for the year. We expect 2011 performance to be our best yet as a public company, with record sales of high-margin metallurgical coal," noted Patriot President and Chief Executive Officer Richard M. Whiting. "Even more important are our strategies for further performance improvements in 2012 and beyond. We are intensely focused on our plans to expand metallurgical coal production to at least 11 million tons by 2013, and we

17

have substantially increased our participation in export thermal markets. Further, as two major legacy coal supply agreements expire, we expect to realize increased EBITDA of around $50 million in 2012 and $150 million in 2013 from higher prices on these volumes. These key factors, coupled with other operating and commercial plans, will significantly enhance Patriot's financial performance."

27.     On May 3, 2011, Patriot Coal filed a Form 10-Q with the SEC that was signed by defendant Schroeder.  The 10-Q further explained the accounting treatment of the court-ordered remediation costs.  In addition, the Form 10-Q included the Company's consolidated financial statements of operations for the three months ended March 31, 2011.  The consolidated financial statements and the explanation regarding capitalization of the remediation costs were false and misleading because they failed to comply with GAAP.  The court-ordered remediation costs should have been recorded as expenses, not as capital expenditures.  Thus, the Company's reported expenses were understated and, in turn, the Company's financial performance was overstated.  Finally, in addition to these false and misleading statements, the Form 10-Q falsely attested to the adequacy of the Company's internal controls, stating in part:

|  | Three Months Ended March 31, | | | |
|  | 2011 | | 2010 | |
|  | (Dollars in thousands, except share and per share data) | | | |
| **Revenues** | | | | |
| Sales | $ | 570,378 | $ | 464,208 |
| Other revenues | | 6,646 | | 3,049 |
| Total revenues | | 577,024 | | 467,257 |
| **Costs and expenses** | | | | |
| Operating costs and expenses | | 515,986 | | 433,491 |
| Depreciation, depletion and amortization | | 44,702 | | 49,612 |
| Reclamation and remediation obligation expense | | 14,454 | | 10,846 |
| Sales contract accretion | | (18,610) | | (25,308) |
| Selling and administrative expenses | | 12,544 | | 12,774 |
| Net gain on disposal or exchange of assets | | (43) | | (23,796) |
| Loss (income) from equity affiliates | | 78 | | (448) |
| **Operating profit** | | 7,913 | | 10,086 |
| Interest expense and other | | 22,860 | | 9,032 |
| Interest income | | (46) | | (3,442) |

18

| | | | | |
|---|---|---|---|---|
| Income (loss) before income taxes | | (14,901) | | 4,496 |
| Income tax provision | | 395 | | 235 |
| | | | | |
| Net income (loss) | $ | (15,296) | $ | 4,261 |
| | | | | |
| **Weighted average shares outstanding:** | | | | |
| Basic | | 91,284,321 | | 90,835,561 |
| Effect of dilutive securities | | - | | 1,331,396 |
| | | | | |
| Diluted | | 91,284,321 | | 92,166,957 |
| | | | | |
| **Earnings (loss) per share:** | | | | |
| Basic | $ | (0.17) | $ | 0.05 |
| Diluted | $ | (0.17) | $ | 0.05 |

Pursuant to the September 1, 2010 ruling, we will record the costs to install the FBR water treatment facility for the three Apogee outfalls as capital expenditures when incurred. The capital expenditure for the facility is estimated to be approximately $50 million. FBR technology had not been used to remove selenium or any other minerals discharged at surface coal mining operations prior to our pilot project that began in February 2010. The FBR water treatment facility, required by the ruling, will be the first of its kind constructed for selenium removal on a commercial scale. We anticipate that the design of the facility will be finalized in mid- to late-2011 and then construction will begin.

\* \* \*

The fair value of our total liability to treat selenium discharges is $117.9 million as of March 31, 2011. The current portion of the estimated liability is $18.1 million and is included in "Accounts payable and accrued expenses" and the long-term portion is recorded in "Reclamation and remediation obligations" on our condensed consolidated balance sheets.

\* \* \*

Item 4.    Controls and Procedures.

As of the end of the period covered by this Quarterly Report on Form 10-Q, we carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures. Based upon that evaluation, the Chief Executive Officer and the Chief Financial Officer have each concluded that our disclosure controls and procedures were designed, and were effective, to ensure

that information required to be disclosed in our reports under the Securities Exchange Act of 1934, as amended, (the "Exchange Act") is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms.

There have not been any significant changes in our internal control over financial reporting during the fiscal quarter to which this report relates that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

28.     On July 26, 2011, Patriot Coal issued a press release in which defendant Whiting discussed "improved performance" and stated that the Company was "nearing a major turning point." In addition, defendant Schroeder touted the Company's generation of more than $20 million in free cash flow.  These positive statements were false and misleading because they were based on the improper accounting of the costs relating to "certain of [the Company's] selenium water treatment requirements." The press release stated in part:

> "Our improved performance this quarter highlights the potential of Patriot's existing operations and the results of our detailed planning and execution," noted Patriot President and Chief Executive Officer Richard M. Whiting. "We are nearing a major turning point in the life of our company."
>
> * * *
>
> "Our cash flow from operating activities topped $80 million this quarter, more than twice the previous quarterly high of $39 million. After covering capital expenditures and a litigation settlement, we generated free cash flow of more than $20 million," added Patriot Senior Vice President and Chief Financial Officer Mark N. Schroeder. "This is a clear indication of our future earnings power and cash flow trends, and our ability to continue to grow our business."

29.     That same day, July 26, 2011, Patriot Coal hosted a conference call with investors, media representatives and analysts to discuss Company's financial results.  During the conference call, defendant Schroeder responded to an analyst's question about the Company's performance moving to the high end of the provided guidance by crediting "capital related to the selenium Hobet mine. ..." Defendant Schroeder failed to disclose the truth about the Company's

20

improper accounting for certain costs that were recorded as capital expenditures rather than as expenses, the actual reason behind the Company's purported success. The following exchange occurred between the analyst and defendant Schroeder:

> **BRANDON BLOSSMAN [ANALYST, TUDOR PICKERING & CO.]:** That's helpful color; I appreciate that. And then kind of going to the other end of the spectrum, detail question for '11 and I think it was asked before. I wasn't sure if I caught the answer. CapEx, it looks like you're moving to the high end of the guidance that you had previously provided. Is that true and is that related to just slight acceleration and the met development or higher costs and kind of related? I think I saw that Peerless is moving up a quarter as far as first call. Is that true or am I misreading prepared comments?

> **MARK SCHROEDER [CFO, PATRIOT COAL]:** First, the guidance I gave at the beginning of the year was 150 million to 175 million so now we're tracking more towards the 175 million. I think it is a combination of trying to get these met mines along the way quicker than what we had anticipated initially plus there is some capital related to the selenium Hobet mine that I talked about in the quarter. We had a P&L charge. There's also some capital related to that and we'll spend some of that capital this year so I think net, net we're closer to the 175 than the 150 sort of a good problem because we're trying to move up some of the met expansion and also a little bit related to selenium related capital. .

30.     On August 5, 2011, Patriot Coal filed a Form 10-Q with the SEC that was signed by defendant Schroeder. The 10-Q discussed the fact that the Company accounted for the court ordered remediation as a capital expenditure and recorded the costs accordingly. The Form 10-Q also included consolidated financial statements of the Company's operations for the three months ended June 30, 2011. Both the consolidated financial statements and the discussion regarding the capitalization of the remediation costs were false and misleading because they failed to comply with GAAP: the court-ordered remediation costs should have been recorded as expenses, not as capital expenditures, Thus, the Company's reported expenses were understated and, in turn, the Company's financial performance was overstated. Finally, in addition to these false and misleading statements, the Form 10-Q falsely attested to the adequacy of the Company's internal controls, stating in part:

21

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (Dollars in thousands, except share and per share data) | | | |
| **Revenues** | | | | |
| Sales | $ 623,902 | $ 533,800 | $ 1,194,280 | $ 998,008 |
| Other revenues | 8,258 | 5,192 | 14,904 | 8,241 |
| Total revenues | 632,160 | 538,992 | 1,209,184 | 1,006,249 |
| **Costs and expenses** | | | | |
| Operating costs and expenses | 560,269 | 504,204 | 1,076,108 | 937,695 |
| Depreciation, depletion and amortization | 46,370 | 50,350 | 91,072 | 99,962 |
| Asset retirement obligation expense | 35,115 | 11,004 | 49,569 | 21,850 |
| Sales contract accretion | (15,815) | (33,735) | (34,425) | (59,043) |
| Restructuring and impairment charge | 137 | 14,838 | 284 | 14,838 |
| Selling and administrative expenses | 14,060 | 13,198 | 26,604 | 25,972 |
| Net gain on disposal or exchange of assets | (9,372) | (17,759) | (9,415) | (41,555) |
| Income from equity affiliates | (2,998) | (1,245) | (2,920) | (1,693) |
| **Operating profit (loss)** | 4,394 | (1,863) | 12,307 | 8,223 |
| Interest expense and other | 16,583 | 14,795 | 39,443 | 23,827 |
| Interest income | (52) | (3,249) | (98) | (6,691) |
| **Loss before income taxes** | (12,137) | (13,409) | (27,038) | (8,913) |
| Income tax provision | 218 | 165 | 613 | 400 |
| **Net loss** | $ (12,355) | $ (13,574) | $ (27,651) | $ (9,313) |
| **Weighted average shares outstanding, basic and diluted** | 91,284,418 | 90,863,950 | 91,284,370 | 90,849,834 |

| Loss per share, basic and diluted | $ | (0.14) | $ | (0.15) | $ | (0.30) | $ | (0.10) |
|---|---|---|---|---|---|---|---|---|

\* \* \*

The order required Hobet to submit by October 1, 2010 a proposed schedule to develop a treatment plan for a Hobet Surface Mine No. 22 outfall and to come into compliance with applicable discharge limits under the permit by May 1, 2013. We submitted the required schedule, which included conducting additional pilot projects related to certain technological alternatives. Based on the results of the pilot projects, a final treatment technology to be utilized at the Hobet Surface Mine No. 22 outfall was submitted to the U.S. District Court in June 2011 in accordance with the submitted schedule. We recorded expense of $24.0 million in the second quarter of 2011 for the estimated future ongoing operating costs of a Fluidized Bed Reactor (FBR) water treatment facility at this outfall. The charge was included in "Asset retirement obligation expense" on our condensed consolidated statements of operations. See Note 14 for the background on these proceedings and the additional impact of these orders on Apogee and Hobet.

\* \* \*

September 1, 2010 U.S. District Court Ruling

On September 1, 2010, the U.S. District Court found Apogee in contempt for failing to comply with the March 19, 2009 consent decree entered in the Federal Apogee Case. Apogee was ordered to install a Fluidized Bed Reactor (FBR) water treatment facility for three outfalls and to come into compliance with applicable selenium discharge limits by March 1, 2013. In September 2010, we increased the portion of the selenium water treatment liability related to Apogee by $20.7 million for the fair value of the estimated future ongoing operating costs related to these three outfalls. We record the costs to install the Apogee FBR water treatment facility as capital expenditures when incurred. As of June 30, 2011, we have spent approximately $5 million on the Apogee FBR facility and the total expenditures are estimated to be approximately $55 million. Preparation of the Apogee FBR facility site began at the end of June 2011 and we anticipate finalizing certain engineering specifications for the Apogee FBR facility in the third quarter of 2011.

Additionally, the U.S. District Court ordered Hobet to submit a proposed schedule to develop a treatment plan for a Hobet Surface Mine No. 22 outfall by October 1, 2010 and to come into compliance with applicable discharge limits under the permit by May 1, 2013. We submitted the required schedule, which included conducting additional pilot projects related to certain technological alternatives. A final treatment technology to be utilized at this Hobet Surface Mine No. 22 outfall was filed with the U.S. District Court in June 2011 in accordance with the submitted schedule. In June 2011, we recorded an adjustment of $24.0 million to the selenium water treatment liability primarily related to the estimated future

ongoing operating costs of an FBR water treatment facility at this outfall. This charge is reflected in "Asset retirement obligation expense" in the condensed consolidated statement of operations. As with the Apogee FBR facility, we will record the costs to install the Hobet FBR water treatment facility as capital expenditures when incurred. Capital expenditures are currently estimated to be approximately $40 million for the Hobet FBR facility. We anticipate beginning construction on the Hobet facility in the second half of 2011.

* * *

As of June 30, 2011, we have a $141.9 million liability recorded for the treatment of selenium discharges. The current portion of the estimated liability is $16.5 million and is included in "Accounts payable and accrued expenses" and the long-term portion is recorded in "Asset retirement obligations" on our condensed consolidated balance sheets.

* * *

Item 4.  Controls and Procedures.

As of the end of the period covered by this Quarterly Report on Form 10-Q, we carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures. Based upon that evaluation, the Chief Executive Officer and the Chief Financial Officer have each concluded that our disclosure controls and procedures were designed, and were effective, to ensure that information required to be disclosed in our reports under the Securities Exchange Act of 1934, as amended, (the "Exchange Act") is recorded, processed, summarized and reported, within the time periods specified in the Securities and Exchange Commission's rules and forms and were also effective to ensure that the information required to be disclosed by us in this Quarterly Report was accumulated and communicated to our management, including our principal executive and principal financial officers to allow timely decisions regarding required disclosure.

There have not been any significant changes in our internal control over financial reporting during the fiscal quarter to which this report relates that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

31.     On February 2, 2012, Patriot Coal hosted a conference call with investors, media representatives and analysts, during which defendant Schroeder responded to growing concerns over the Company's capital expenditures but misrepresented the Company's capital expenditures, especially as they related to "selenium related" costs.  The following exchange

24

occurred between the analysts participating on the call and defendant Schroeder:

* * *

**MARK SCHROEDER [CFO, PATRIOT COAL]:** ... For 2012 we expect capital expenditures in the range of $160 million to $180 million. Influencing our capital expenditures will be some deferral our met expansion, certainly some redeployment of equipment in certain cases, and increased expenditures on is II selenium treatment. Looking to the 2012 quarters, first quarter will include expenses related to today's idling of the Big Mountain complex, and we expect to be at the low end of tons sold in the first quarter. We expect both first and third quarter operations to be impacted by 10ngwall moves at Federal. And at Panther the next longwall move is scheduled for the fourth quarter.

* * *

**DAVID MARTIN [ANALYST, DEUTSCHE BANK]:** Yeah, okay. Okay. And then secondly on the CapEx plan for this year, could you give us a little more detail or clarity on what the distributions of that spending is between maintenance and what is environmental and what Is selenium related, etc?

**SCHROEDER:** Sure. I guess I would probably use numbers like 25% to 30% on the what we call government required and that would include the selenium environmental type capital that we would have. So 25% to 30% of that. About the same thing on the met expansion. Somewhere in the 25% range.

And then that leaves about 40% to 50% being more 01 the maintenance-type capital and the maintenance then covers mainly rolling stock at the thermal and met mines in Appalachia but also some in the Illinois basin as well So maybe it is a third or less related to projects, 25% to 30% on projects. 25% or 30% or so on selenium related and 50% or are so the maintenance.

* * *

**LUCAS PIPES [ANALYST, GREEN, MURRAY, CARRET]:** Thank you. That's helpful. And then a quick follow-up on the CapEx side. Essentially all 01 the selenium charges that you mentioned you had in the comprehensive plan in place, so all 01 those charges are already included in the CapEx number. Is that correct?

**SCHROEDER:** Yes, the CapEx guidance that I gave 01160 to 180 does include selenium related items in that number.

32.     On February 23, 2012 Patriot Coal filed with the SEC a Form 10-K that was

25

signed by Defendants and discussed the accounting treatment of court-ordered remediation costs. In addition, the Form 10-K included consolidated financial statements of the Company's operations for the year ended December 31, 2011. The consolidated financial statements and the explanation regarding the capitalization of the remediation costs were false and misleading because they failed to comply with GAAP. The court-ordered remediation costs should have been recorded as expenses, not as capital expenditures. Thus, the Company's reported expenses were understated, thereby ooverstating the Company's financial performance. Finally, in addition to these false and misleading statements, the Form 10-K falsely attested to the adequacy of the Company's internal controls, stating in part:

> Pursuant to the September 1, 2010 ruling, we will record the costs to install the FBR water treatment facility for the three Apogee outfalls as capital expenditures when incurred. The capital expenditure for the facility is estimated to be approximately $55.0 million. In addition, the estimated future on-going operating cash flows required to meet our legal obligation for selenium water treatment at the three Apogee outfalls have changed from our original estimates based on the September 1, 2010 ruling. As such, we increased the portion of the liability related to Apogee by updating the fair value of the on-going costs related to these three outfalls and recorded the $20.7 million difference between this updated value and our previously recorded liability directly to income, through asset retirement obligation expense in the third quarter of 2010.

> \* \* \*

> *September 1, 2010 U.S. District Court Ruling*

> On September 1, 2010, the U.S. District Court found Apogee in contempt for failing to comply with the March 19, 2009 consent decree entered in the Federal Apogee Case. Apogee was ordered to install a Fluidized Bed Reactor (FBR) water treatment facility for three outfalls and to come into compliance with applicable selenium discharge limits at these three outfalls by March 1, 2013. In September 2010, we increased the portion of the selenium water treatment liability related to Apogee by $20.7 million for the fair value of the estimated future ongoing operating costs related to these three outfalls. This charge is reflected in "Asset retirement obligation expense" in the consolidated statement of operations. We record the costs to install the Apogee FBR water treatment facility as capital expenditures when incurred. As of December 31, 2011, we have spent

26

approximately $12.6 million on the Apogee FBR facility and the total expenditures are estimated to be approximately $55 million. We began construction on the Apogee FBR facility in the third quarter of 2011.

Additionally, the U.S. District Court ordered Hobet to submit a proposed schedule to develop a treatment plan for a Hobet Surface Mine No. 22 outfall by October 1, 2010 and to come into compliance with applicable discharge limits under the permit by May 1, 2013. We submitted the required schedule, which included conducting additional pilot projects related to certain technological alternatives. A treatment technology to be utilized at this Hobet Surface Mine No. 22 outfall was filed with the U.S. District Court in June 2011 in accordance with the submitted schedule. In June 2011, we recorded an adjustment of $24.0 million to the selenium water treatment liability primarily related to the estimated future ongoing operating costs of an FBR water treatment facility at this outfall. This charge is reflected in "Asset retirement obligation expense" in the consolidated statement of operations.

In December 2011, the Special Master appointed by the U.S. District Court to oversee the Hobet Surface Mine No. 22 project approved Hobet's request to substitute ABMet selenium treatment technology for the FBR technology at this outfall. The U.S. District Court subsequently confirmed this substitution. As with the Apogee FBR facility, we will record the costs to install the Hobet ABMet water treatment facility as capital expenditures when incurred. We continue to design and seek permits for the Hobet ABMet facility and anticipate beginning construction on the facility in the first half of 2012. The estimated total expenditures for completing the ABMet water treatment facility is approximately $25 million, which is significantly less than the estimated $40 million to build the Hobet FBR facility.

In December 2011, we adjusted the portion of the selenium water treatment liability related to Hobet Surface Mine No. 22 by $10.3 million for the decrease in the fair value of the estimated future ongoing operating costs related to this outfall due to the change in the technology. We also wrote off approximately $3.0 million related to final engineering specifications for the Hobet FBR facility. These charges are reflected in "Asset retirement obligation expense" in our consolidated statement of operations.

* * *

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2011** | **2010** | **2009** | **2008** | **2007** |
| | (In thousands, except for share and per share data) | | | | |
| **Results of Operations Data:** | | | | | |
| Revenues | | | | | |
| Sales | $ 2,378,260 | $ 2,017,464 | $ 1,995,667 | $ 1,630,873 | $ 1,069,316 |
| Other revenues | 24,246 | 17,647 | 49,616 | 23,749 | 4,046 |
| Total revenues | 2,402,506 | 2,035,111 | 2,045,283 | 1,654,622 | 1,073,362 |
| Costs and expenses | | | | | |
| Operating costs and expenses | 2,213,124 | 1,900,704 | 1,893,419 | 1,607,746 | 1,109,315 |
| Depreciation, depletion and amortization | 186,348 | 188,074 | 205,339 | 125,356 | 85,640 |
| Asset retirement obligation expense | 81,586 | 63,034 | 35,116 | 19,260 | 20,144 |
| Sales contract accretion | (55,020) | (121,475) | (298,572) | (279,402) | — |
| Restructuring and impairment charge | 13,657 | 15,174 | 20,157 | — | — |
| Selling and administrative expenses | 52,907 | 50,248 | 48,732 | 38,607 | 45,137 |
| Other operating (income) expense: | | | | | |
| Net gain on disposal or exchange of assets[1] | (35,557) | (48,226) | (7,215) | (7,004) | (81,458) |
| Loss (income) from equity affiliates[2] | (4,709) | (9,476) | (398) | 915 | (63) |
| Operating profit (loss) | (49,830) | (2,946) | 148,705 | 149,144 | (105,353) |
| Interest expense and other | 65,533 | 57,419 | 38,108 | 23,648 | 8,337 |
| Interest income | (246) | (12,831) | (16,646) | (17,232) | (11,543) |
| Income (loss) before income taxes | (115,117) | (47,534) | 127,243 | 142,728 | (102,147) |
| Income tax provision | 372 | 492 | — | — | — |
| Net income (loss) | (115,489) | (48,026) | 127,243 | 142,728 | (102,147) |
| Net income attributable to noncontrolling interest[2] | — | — | — | — | 4,721 |
| Net income (loss) attributable to Patriot | (115,489) | (48,026) | 127,243 | 142,728 | (106,868) |
| Effect of noncontrolling interest purchase arrangement | — | — | — | — | (15,667) |

\* \* \*

## Item 9A. Controls and Procedures,

As of the end of the period covered by this Annual Report on Form 10-K, we

28

carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures. Based upon that evaluation, the Chief Executive Officer and the Chief Financial Officer have each concluded that our disclosure controls and procedures were designed, and were effective, to ensure that information required to be disclosed in our reports under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), is recorded, processed, summarized and reported, within the time periods specified in the Securities and Exchange Commission's rules and forms. …

\* \* \*

**Management's Report on Internal Control Over Financial Reporting**

Management is responsible for maintaining and establishing adequate internal control over financial reporting. Our internal control framework and processes were designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of our consolidated financial statements for external purposes in accordance with U.S. generally accepted accounting principles.

33.     Included with the Form 10-K for fiscal year 2011, Defendants signed required certifications pursuant to SOX, substantially similar to the certifications described in ¶25, *supra*, and falsely attested to the purported accuracy and completeness of their disclosures and effectiveness of the Company's internal controls.

34.     Defendants knew but concealed from investors during the Class Period the following material adverse information:

(a)     the Company's internal controls over financial reporting were materially inadequate;

(b)     Defendants improperly accounted for selenium treatment facility liabilities at the Company's mines;

(c)     the Company's reported financial results were overstated and were not presented in conformity with GAAP;

29

(d)     the Company's business health was weakening; and

(e)     as a result of the forgoing, the Company would not survive as a going

concern.

### DISCLOSURES AT THE END OF THE CLASS PERIOD

35.     On May 8, 2012, Patriot Coal filed a Form 8-K with the SEC disclosing that

Defendants improperly capitalized the costs of "certain of its selenium water treatment

requirements." As a result of the improper accounting of these remediation costs the Company's

purported financial results were overstated.  The SEC, however, had uncovered the Defendants'

facade and forced them to restate two years' worth of materially false and misleading financial

statements.  The Form 8-K stated in part:

**Item 4.02. Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

On May 7, 2012, Patriot's management advised the Audit Committee of Patriot's Board of Directors, and the Audit Committee then recommended to the Board of Directors, that Patriot's previously issued annual consolidated financial statements for the years ended December 31, 2011 and 2010 and the independent registered public accountant's report thereon, and the consolidated financial statements for the third and fourth quarters of the year ended December 31, 2010 and each of the four quarters of the year ended December 31, 2011, in each case filed with the Securities and Exchange Commission (the "SEC"), should no longer be relied upon as a result of an error contained therein. The Board of Directors resolved to follow this recommendation.

As disclosed in Patriot's Form 10-K for the year ended December 31, 2011, filed on February 23, 2012, Patriot received comments from the staff of the SEC regarding its accounting treatment for certain of its selenium water treatment requirements. Specifically, these comments related to Patriot's fluidized bed reactor ("FBR") and ABMet facilities (together, the "Apogee FBR and Hobet ABMet water treatment facilities"). Patriot recorded as capital expenditures when incurred the costs to install the FBR water treatment facility that Apogee Coal Company, LLC ("Apogee") is required to construct for three outfalls and the ABMet water treatment facility that Hobet Mining, LLC ("Hobet") is required to construct for Surface Mine No. 22. As disclosed in Patriot's Form 10-K for the year ended December 31, 2011, the total capital expenditure is estimated to be

30

approximately $55.0 million for the Apogee FBR water treatment facility and $25.0 million for the Hobet ABMet water treatment facility.

In response to the comments received from the SEC, Patriot reviewed its accounting treatment for the Apogee FBR and Hobet ABMet water treatment facilities. As a result of that review, Patriot, in consultation with its independent registered public accountants, has determined it is necessary to restate its previously issued consolidated financial statements to accrue a liability and recognize a loss for the estimated costs of installing these two water treatment facilities as their primary use will be to treat selenium exceedances in water discharges resulting from past mining under legacy permit standards. Accordingly, Patriot intends to file on or about May 8, 2012 with the SEC an amended Annual Report on Form 10-K/A for the year ended December 31, 2011 to restate its audited consolidated financial statements for the years ended December 31, 2011 and 2010. Such restatement is increasing Patriot's asset retirement obligation expense and net loss by $23.6 million and $49.7 million for the years ended December 31, 2011 and 2010, respectively. …

* * *

36.    Despite the partial disclosure of Defendants' incorrect accounting of the Company's "selenium water treatment requirements," the May 8, 2012 Form 8-K was nevertheless misleading because it depicted the restatement as having minimal impact to the Company's financial statements, stating: "Such restatement has no impact on Patriot Coal's revenue or Adjusted EBITDA for any such prior period."   However, Defendants failed to indicate that these misstatements were material to the Company's bottom line and earnings per share.  SEC Staff Accounting Bulletin No. 99 ("SAB 99"), Materiality, states that: "A matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important."   SAB 99 also stresses that materiality requires qualitative, as well as quantitative, considerations.   Defendants' failure to properly account for the court-ordered remediation obligations was both quantitatively and qualitatively material, as the reported net losses for the years ended December 31, 2010 and 2011 were increased by over 104% and 20%, respectively, as a result of the restatement.  The Form 8-K stated in part:

31

> Such restatement has no impact on Patriot's revenue or Adjusted EBITDA for any such prior period. Patriot's estimated cash spending for the Apogee FBR and Hobet ABMet water treatment facilities has not changed from prior disclosures as a result of this restatement.

37.     In addition to announcing the restatement in the May 8, 2012 Form 8-K, the Company also disclosed that "management has determined that a deficiency in internal control over financial reporting associated with the accounting treatment for the Apogee FBR and Hobet ABMet water treatment facilities should have been classified as a material weakness." The Form 8-K stated in part:

> In connection with the restatement, management has determined that a deficiency in internal control over financial reporting associated with its accounting treatment for the Apogee FBR and Hobet ABMet water treatment facilities should have been classified as a material weakness with regard to the years ended December 31, 2011 and 2010. Patriot has remediated this material weakness..

38.     As a result of Defendants' false statements, Patriot Coal's stock traded at artificially inflated levels during the Class Period.   However, when the true state of the Company's financial health and internal controls began to emerge, Patriot Coal's shares dropped from a closing price of $5.53 on May 8, 2012, to a closing price on May 9, 2012 of $5.31 -- a decline of approximately 5% on volume of more than 12 million shares.

39.     The drop in the Company's stock price was diminished, however, because the Defendants were causing the Company to mislead the market about its aggressive sales forecast for 2013 at the same time the Company was issuing a partial disclosure about its overstated financial statements and deficient internal controls.   The same Form 8-K that announced the restatement and disclosed that the Company's internal controls were deficient also provided the following aggressive guidance:

32

| (Tons in millions) | Q2 – Q4 2012 | | 2013 | |
|---|---|---|---|---|
| | Tons | Price per ton | Tons | Price per ton |
| Appalachia—thermal | 8.8 | $  66 | 3.3 | $  68 |
| Illinois Basin—thermal | 4.8 | $  50 | 4.0 | $  50 |
| Appalachia—met | 4.9 | $  138 | 0.4 | $  120 |
| Total | 18.5 | | 7.7 | |

40.    One week later, on May 15, 2012, Patriot Coal filed a Form 8-K with the SEC cutting its previous forecast for sales of steel-making coal mined in Appalachia, resulting from a potential customer default.  The revision forecast sales of 3.9 million tons at an average price of $142 per ton in the second quarter through the fourth quarters, compared with the previous May 8, 2012 projection of 4.9 million tons at $138 per ton.   Moreover, the Form 8-K revised downward the Company's 2013 forecast for Appalachian metallurgical coal, from 400,000 tons at $120 per ton previously to 200,000 tons at $122 per ton.  The Form 8-K stated in part:

> ST. LOUIS, May 14 – Patriot Coal Corporation (NYSE: PCX) announced today that it is revising its outlook provided in its press release issued on May 8, 2012. Based on recent developments involving the potential default by a key customer, Patriot, with respect to its currently priced tons of Appalachia – met coal, revises its anticipated sales volume and average selling prices as set forth below. The current spot market price for this quality of high volatile coal is approximately $25 to $30 per ton lower than the original contracted price with that customer.
>
> Average selling prices of currently priced tons for the remainder of 2012 and for 2013 are as follows:

| (Tons in millions) | Q2 – Q4 2012 | | 2013 | |
|---|---|---|---|---|
| | Tons | Price per ton | Tons | Price per ton |
| Appalachia - met | 3.9 | $142 | 0.2 | $  122 |

41.    Following this news, Patriot Coal's shares dropped from a closing price of $4.83 on May 14, 2012, to a closing price of $3.94 on May 15, 2012.  This one-day drop amounted to a

decline of over 18% on volume of more than 19 million shares.

42.    On May 22, 2012, Patriot Coal issued a Form 8-K which alluded to a May 22, 2012 letter from defendant Whiting to the Company's employees.   The letter only partially disclosed the Company's precarious capital position, stating that that the Company engaged a financial services company, The Blackstone Group, "to achieve an optimal financing package." However, the May 22, 2012 letter failed to fully disclose the truth about the Company's impending bankruptcy.    Instead, Whiting's letter assured investors that "operations are performing well" and that the Company is positioned for "future growth," stating in part:

> I am writing each of you to provide an update on the proactive initiatives we are taking to help ensure Patriot remains strong during these challenging times in our industry.
>
> Across our business, operations are performing well. We are achieving outstanding safety results, and we have taken decisive action to scale our production to match market demand. Our operational excellence and the flexibility of our modular met coal production portfolio are a distinct competitive advantage for our company.
>
> Our management team has acted swiftly to ensure that we are well-positioned in the current operating environment.  We have reduced thermal coal production by over four million annual tons, delayed expansions under the Met Build-Out program, and worked closely with our customers to address their changing needs. In addition, we have implemented major cost reduction initiatives, including assuming full operation of several mines and facilities that were previously managed by contractors and adjusting our workforce appropriately.
>
> We are also addressing a number of challenges that current market conditions have created. Last week, we adjusted our forecast for the year to reflect a possible default by a key customer on a contract for Appalachia met coal. We continue to be in discussions with the customer and other potential buyers for this allotment of coal, and we are confident it will ultimately be sold – although not at the original contract price, which was measurably higher than the current spot market. As you know, we and other coal producers have encountered similar business situations in the past and we have successfully achieved satisfactory resolutions.

34

Earlier this month, we announced that Patriot has entered into a commitment letter for a new revolving credit facility and new term loan facility for a total of $625 million. We are continuing to work with our lenders to strengthen our finances, including the refinancing of our debt obligations that become due in March 2013. We have engaged The Blackstone Group and continue to work with Davis Polk & Wardwell, our long-standing counsel, to achieve an optimal financing package. As we work through these matters, we continue to have access to our current credit facilities.

We believe the actions we are taking will see us through these challenging times and position us for future growth. Despite the current domestic headwinds we are facing, the global market for both thermal and met coal is creating export opportunities for our company. We are aligning our operating portfolio to take advantage of these opportunities.

Please also keep in mind that our industry is inherently cyclical. For that reason, our leadership team has extensive prior experience in managing through variable and difficult markets. You may recall, for instance, that in 2009 we successfully navigated through one of the greatest market dislocations in history. I am confident we will do so again. …

43.    Following this news, Patriot Coal's shares declined from a closing price of $3.36 on May 21, 2012, to a closing price on May 22, 2012 of $2.18 -- a one-day decline of over 35% on very high volume of more than 86 million shares traded.

44.    Less than two months after defendant Whiting assured the market of the Company's ability to sustain itself going forward, on July 9, 2012 Patriot Coal issued a press release disclosing that the Company "and substantially all of its wholly owned subsidiaries have filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Southern District of New York."  According to the press release, the Company's decision to file bankruptcy resulted from "challenging environmental regulations affecting the cost of producing and using coal" and "rising expenditures for environmental and other liabilities that severely constrained the Company's liquidity and financial flexibility," among other things.  The press release stated, in relevant part:

ST. LOUIS, July 9, 2012 /PRNewswire/ -- Patriot Coal Corporation (NYSE: PCX), a producer and marketer of coal products in the eastern United States, announced today that Patriot and substantially all of its wholly owned subsidiaries have filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Southern District of New York. Patriot has taken this action in order to undertake a comprehensive financial restructuring. Patriot expects its mining operations and customer shipments to continue in the ordinary course throughout the reorganization process.

Patriot believes that the protection afforded by a court-supervised reorganization process, including the ability to access new financing, will provide the Company with additional time and flexibility to address its financial challenges and position Patriot for long-term viability and success.

In conjunction with its reorganization, Patriot has obtained a commitment for $802 million in debtor-in-possession (DIP) financing from Citigroup Global Markets Inc., Barclays Bank PLC, and Merrill Lynch, Pierce, Fenner & Smith Incorporated as joint lead arrangers. Upon approval by the Bankruptcy Court, the new financing and cash generated from Patriot's ongoing operations will be used to support the business during the reorganization process.

* * *

Patriot's business outlook has been impacted by a number of challenges that are affecting the coal industry, including reductions in U.S. thermal coal demand due to competition from low priced natural gas, challenging environmental regulations affecting the cost of producing and using coal, and weaker international and domestic economies. The Company has reacted to the lower domestic demand by reducing production and increasing sales to the export markets. During recent months, the cancellation of customer contracts, lower thermal coal prices and rising expenditures for environmental and other liabilities have severely constrained the Company's liquidity and financial flexibility.

45.     As a result of Defendants' false statements, Patriot Coal's stock traded at artificially inflated levels during the Class Period.  However, when the true state of the Company's capital position and business prospects as a going concern became public, Patriot Coal's shares declined from a closing price of $2.19 on July 6, 2012, to a closing price on July 9, 2012 of $0.61 – a one-day decline of over 72% on volume of over 38 million shares.

### CLASS ACTION ALLEGATIONS

46.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Patriot Coal securities during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

47.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. At the time Patriot Coal declared bankruptcy, the Company had more than 92.8 million shares of stock outstanding, owned by thousands of persons.

48.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

49.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

50.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and financial prospects of Patriot Coal; and

(c)    the extent of Class members' damages and the proper measure of

damages.

51.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

52.     The market for Patriot Coal securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Patriot Coal securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Patriot Coal securities relying upon the integrity of the market price of the Company's securities and market information relating to Patriot Coal, and have been damaged thereby.

53.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Patriot Coal securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Patriot Coal's financial well-being and prospects as alleged herein.

54.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the

38

damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period Defendants made or caused to be made a series of materially false and/or misleading statements about Patriot Coal's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

55.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

56.     During the Class Period, Plaintiff and the Class purchased Patriot Coal securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

57.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced

in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Patriot Coal, his/her control over, and/or receipt and/or modification of Patriot Coal's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Patriot Coal, participated in the fraudulent scheme alleged herein.

### APPLICABILITY OF PRESUMPTION OF RELIANCE
### (FRAUD-ON-THE-MARKET DOCTRINE)

58.    The market for Patriot Coal securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Patriot Coal securities traded at artificially inflated prices during the Class Period. On February 1, 2011, the Company's stock closed at a Class-Period high of $28.44 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Patriot Coal securities and market information relating to Patriot Coal, and have been damaged thereby.

59.    During the Class Period, the artificial inflation of Patriot Coal securities was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Patriot Coal financial well-being and prospects.  These material misstatements and/or omissions created an unrealistically positive assessment of Patriot Coal and its prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company

40

securities.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

60.   At all relevant times, the market for Patriot Coal securities was an efficient market for the following reasons, among others:

(a)    Patriot Coal securities met the requirements for listing, and were listed and actively traded on the New York Stock Exchange (NYSE), a highly efficient and automated market;

(b)    as a regulated issuer, Patriot Coal filed periodic public reports with the SEC and/or the NYSE;

(c)    Patriot Coal regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    Patriot Coal was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

(e)    As a result of the foregoing, the market for Patriot Coal securities promptly digested current information regarding Patriot Coal from all publicly available sources and reflected such information in Patriot Coal's stock price.  Under these circumstances, all purchasers of Patriot Coal securities during the Class Period suffered similar injury through their

purchase of Patriot Coal securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

61.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.   In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Patriot Coal who knew that the statement was false when made.

## FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

62.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

63.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Patriot Coal securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

64.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Patriot Coal securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

65.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Patriot Coal's financial well-being and prospects, as specified herein.

66.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Patriot Coal's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Patriot Coal and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a

43

course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

67.     The defendants had actual knowledge of the misrepresentations and/or omissions of  material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Patriot Coal financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

68.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Patriot Coal securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Patriot Coal securities during the Class Period at artificially high prices and were damaged thereby.

69.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff

44

and the other members of the Class and the marketplace known the truth regarding the problems that Patriot Coal was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Patriot Coal securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

70.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

71.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of The Exchange Act**
**Against Defendant Whiting**

72.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

73.     Defendant Whiting acted as a controlling person of defendant Schroeder within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of his positions, with the Company, defendant Whiting had the power and authority to cause defendant Schroeder to engage in the wrongful conduct complained of herein.  Defendant Whiting controlled defendant Schroeder and all of the Company's employees.  By reason of such conduct, defendant Whiting is liable pursuant to Section 20(a) of the Exchange Act.

74.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to

control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

75.        As a direct and proximate result of Defendant Whiting's wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)  Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)  Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)  Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: October 5, 2012                    **WEHRLE LAW LLC**

                                                /s/ J. Christopher Wehrle
                                        By:_____
                                        J. Christopher Wehrle, 45592MO
                                        Clayton Plaza West
                                        7750 Clayton Road, Suite 102
                                        St. Louis, Missouri 63117
                                        Telephone: (314) 334.0119
                                        Facsimile: (314) 754.8313
                                        chris@wehrlelawllc.com

                                        **GLANCY BINKOW & GOLDBERG LLP**
                                        Lionel Z. Glancy
                                        Michael Goldberg
                                        1925 Century Park East, Suite 2100
                                        Los Angeles, California 90067
                                        Telephone: (310) 201-9150
                                        Facsimile: (310) 201-9160
                                        info@glancylaw.com

                                        Attorneys for Plaintiff